36 C.C.P.A. (Patents)

**Application of CREMER et al.**
**Patent Appeal No. 5524.**

United States Court of Customs
and Patent Appeals.

March 7, 1949.

Asher Blum, of New York City (Ben Cohen, of Washington, D. C., of counsel), for appellants.

W. W. Cochran, of Washington, D. C. (J. Schimmel, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL and JOHNSON, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office, affirming that of the Primary Examiner rejecting six claims numbered respectively 1, 10, 13, 18, 19, and 25, embraced in appellants' application for patent, serial No. 469,436, for both a method and an apparatus for testing rubber articles and other articles made of insulating material, such as rubber sheath prophylactics, to ascertain whether such articles have minute holes too small to be seen.

Ten claims stand allowed, all being apparatus claims. Of the appealed claims only claim 10 is directed to method.

Claims 1, 10, 13, and 25 were grouped by the board as relating to testing and classifying, or sorting, the rubber or like articles, and claims 18 and 19 grouped as relating to the mechanism used at what is referred to as the loading station. We here reproduce claims 1, 10, and 18:

"1. Mechanism for testing a body which is made of insulating material, said mechanism including an electrical testing station and also including a succeeding classifying station, said mechanism also including conveyor means for moving said body to said electrical testing station and then to said classifying station, said classifying station having movable classifying means, said classifying means being movable to respective 'bad' and 'good' positions which correspond respectively to the location of respective bad and good objects at said preceding testing station, said classifying means being biased to the 'bad' position, electro-mechanical means having a normally open circuit, said electro-mechanical means being connected to said classifying means and moving said classifying means to the 'good' position only when said circuit is closed, means for subjecting spaced parts of said body to a difference in potential at said testing station in order to pass through said body a testing current which is inversely proportional to the resistance of said body, said circuit having circuit-closing means which are biased to circuit-opening position, electrical actuating means for moving said circuit-closing means to circuit-closing position when said electrical actuating means are energized, said electrical actuating means having a normally open circuit, control means operated and controlled by said testing current to close the circuit of said electrical actuating means only when said testing current is less than a predetermined minimum, said mechanism also having means for removing said body from said conveyor means, at a station which succeeds said classifying station.

"10. A method of testing and classifying an object which is made of insulating material, which consists in transporting said object on a conveyor through a predetermined path which includes a testing station and a succeeding classifying station

378

which has movable classifying means which are biased to the 'bad' position and which are movable to a 'good' position, which consists in subjecting said object at said testing station to a leakage current test and controlling the respective position of said classifying means by said leakage current to move said classifying means to the 'good' position only if the leakage current is less than a predetermined minimum, and removing said objects from said conveyor in separate batches according to said classification of said objects, said objects being thus removed after said leakage current test has been wholly completed.

"18. Mechanism for testing objects made of insulating material, comprising an endless conveyor, means adapted to guide and to actuate said conveyor in a predetermined path, spaced carriers tiltably connected to said conveyor, said path including a loading station, automatic movable means located anterior said loading station and constructed and operative to tilt selected carriers in one lateral direction relative to said conveyor and to tilt other selected carriers in the opposite lateral direction."

Claim 19, in addition to the elements in claim 18, specifies "automatic means located after said loading station to bring said carriers into substantial parallel relation."

The following patents were cited as references: Hazard, 1,254,690, January 29, 1918; Barton, 1,983,892, December 11, 1934; Purdy, 2,016,455, October 8, 1935; Braden, 2,084,186, June 15, 1937; Youngs et al., 2,244,591, June 3, 1941.

Of these the patent to Youngs et al. was regarded as the principal reference.

The following descriptive matter is taken from the decision of the examiner:

"The subject matter of the rejected claims is an apparatus for testing and assorting rubber articles to ascertain the presence of imperfections such as minute perforations. The article in the form of a rubber tube is carried on a mandrel formed of electrically conducting material tiltably mounted on an endless conveyor and electrically insulated therefrom. During the movement of the conveyor the articles are immersed in a conducting liquid and while so immersed they are subject to an electric potential impressed between the conducting mandrel and the conducting liquid. The potential is impressed by brushes which contact an exposed portion of the mandrel extending above the article above the surface of the liquid. If the article is free from imperfections, such as minute perforations, this impressed potential will remain on the mandrel as a negative electrostatic charge of a definite potential.

"After passing these brushes the exposed portion of the mandrel is brought into contact with a brush which is electrically connected to the grid of a vacuum tube which is normally maintained non conductive by the grid having periodically impressed thereon a negative bias. If the rubber article is defective, the negative potential applied to the mandrel will have leaked off to the conducting liquid by the time that the mandrel is brought into contact with the brush in circuit with the grid. Thus the negative charge on the grid is decreased to an extent to render the vacuum tube conductive. The plate of this tube is connected through a resistance to a circuit including a condenser and the grid of another electronic tube. This latter tube is normally conducting when the first tube is maintained non conducting. However if by reason of the passage of a defective article the first tube is rendered conducting, the drop in voltage across the resistance in circuit with the plate of the first tube causes an increase of the negative bias of the second tube so that the latter is rendered non conducting. The circuit of the second tube includes a relay which controls the operation of an electromagnet operating a deflector, normally biased by a spring into position to engage the mandrels and to tilt them on a horizontal axis into position indicating the article as defective. If the article is good, and the first tube thus rendered non-conductive, the second tube will be rendered conductive and will close its relay to energize the operating magnet to set the deflector into position to tilt the mandrel to an opposite position on the conveyor so as to indicate that the article is good. Thus the articles when removd from the conveyor at a succeeding station are separated into two groups, one group com-

posing the perfect articles and the other group composing the imperfect articles."

It is pointed out by the board that the Youngs et al. patent "shows a similar organization for exactly the same purpose" as that of appellants here involved, and a description of the patent is given which we reproduce, omitting the numerals as indicated by asterisks and making some insertions in brackets: "* * * A mandrel with the article to be tested [is] passed successively to [an] electrode * * * grounding any charge, then to [a second] electrode * * *, impressing a negative charge, and finally to [a third] electrode * * *, connected to the grid of [a] vacuum tube * * *. A negative charge 'blocks' the tube. A failure of the insulation due to imperfection of the rubber article removes the charge from the grid causing current to flow through the tube. This actuates [a] solonoid * * * which in turn displaces a switch pin on the timing disk * * *. At an appropriate point in the travel of the conveyor the switch pin closes a circuit which opens air valves which in turn remove the defective article from the mandrel. The 'good' articles are then removed at a later point on the conveyor. It will be noted that the Youngs et al mechanism is biased toward the 'good' or insulating articles rather than the 'bad' or conducting articles. The claims under discussion are said to distinguish from Youngs et al primarily in this 'bias' and in the means required to accomplish this result, and this distinction is urged as of patentable significance."

The description of the Youngs et al. patent, given by the examiner in his statement following the appeal to the board, goes into greater detail but it is thought that all the essential features are embraced in the board's description as quoted.

Except for a special reference to claim 10, the board discussed claims 1, 10, 13, and 25 as a group (group 1) and claims 18 and 19 as group 2. The examiner, however, discussed each claim of group 1 separately and rejected them as follows: Claim 1 on Youngs et al. (referring to Braden upon a question of amplification hereinafter discussed); claim 10, first, as

drawn to the function of the apparatus and, second, as not patentably distinguishable from either Youngs et al. or Purdy "especially in view of Hazard;" claim 13 as unpatentable over Youngs et al. in view of Braden; and claim 25 on Youngs et al. in view of Braden. He considered claims 18 and 19, constituting the second group, together and rejected them, first, as being incomplete and functional and, second, as "not patentably distinguished from Barton."

The board disapproved the rejection of claims 18 and 19 on the ground of incompleteness and functionality. So, that question is not before us. The rejection on Barton was affirmed.

In the course of his decision the examiner analyzed the several claims and read claims 1 and 13 upon the Youngs et al. disclosure. His analysis of claim 1 reads as follows:

"1. Mechanism for testing a body which is made of insulating material,

"(a) said mechanism including an electrical testing station

"(b) and also including a succeeding classifying station,

"(c) said mechanism also including conveyor means for moving said body to said electrical testing station and then to said classifying station,

"(d) said classifying station having movable classifying means, said classifying means being movable to respective 'bad' and 'good' positions which correspond respectively to the location of respective bad and good objects at said preceding testing station, said classifying means being biased to the 'bad' position,

"(e) electro-mechanical means having a normally open circuit, said electro-mechanical means being connected to said classifying means and moving said classifying means to the 'good' position only when said circuit is closed,

"(f) means for subjecting spaced parts of said body to a difference in potential at said testing station in order to pass through said body a testing current which is inversely proportional to the resistance of said body,

"(g) said circuit having circuit-closing means which are biased to circuit-opening position,

"(h) electrical actuating means for moving said circuit-closing means to circuit-closing position when said electrical actuating means are energized,

"(i) said electrical actuating means having a normally open circuit,

"(j) control means operated and controlled by said testing current to close the circuit of said electrical actuating means only when said testing current is less than a pre-determined minimum,

"(k) said mechanism also having means for removing said body from said conveyor means, at a station which succeeds said classifying station."

It is not deemed necessary to set forth in detail the text of the examiner's application of claim 1 to the Youngs et al. disclosure because it is not disputed on behalf of appellants that some features of the claim are met by the patent disclosures. Except for purposes of explanation or clarification, we need consider only the challenged features.

The brief for appellants in its analysis of claim 1, although, in most instances, using different phraseology, follows generally the order followed by the examiner and points out the particular features which, it is claimed, are not disclosed by the prior art.

As may be observed from the examiner's analysis, claim 1 requires a testing station, a classifying station, and a station where the articles, after being tested and classified, are removed from the conveyor, the last requirement being the final clause of the claim.

The examiner found the testing station in the Youngs et al. patent to be at a tank which, with its accompanying features, is fully described in the specification. The classifying station he found to be shown in a sub-combination, made up of numerous elements, identified in Figure 1 of the Youngs et al. drawings by the term "Rejection." Each material feature of the sub-combination also is described in the specification. The removal station re-

quired, as stated in the examiner's analysis—(k), supra,—was found by him to be shown in the Youngs et al. patent by the arrangement, or sub-combination, shown in Figure 1 of the drawings, marked "Visual inspection and take off station." In the patent, the classifying station designated by the examiner succeeds the testing station and the removal station succeeds the classifying station. All three appear at different points passed by the conveyor (which consists of an endless chain or the like) and are separate from each other.

Appellants have not challenged the correctness of the examiner's finding as to the three elements designated by the examiner as (a), (b), and (k), supra, but the brief on their behalf asserts (1) "No reference shows a classifying station, as distinguished from an ejection station," and (2) "No reference shows a classifier, as distinguished from an ejector."

A careful examination of the appealed claims reveals that neither the term "ejector" nor the phrase "ejection station" is used in any one of them, nor have we found those terms in the specification. The brief for appellants, however, states that the final element of claim 1, supra, reading " * * * means for removing said body from said conveyor means, at a station which succeeds said classifying station," refers to certain features shown in a figure of appellants' drawings and defined in their specification as "strippers." It is taught that by means of the strippers (the stripping mechanism as a whole is somewhat complicated) the articles which have been tested and classified are stripped from their forms, the good ones being deposited in one bin and the defective ones in another bin. It is assumed that the stripper mechanism by which the articles are removed from the conveyor is what appellants had in mind when, in their brief, they referred to "ejector" and "ejection station." We find nothing else in their specification to which the terms would seem to relate. The stripper mechanism succeeds the classifying station and is separate from it.

As has been stated, the examiner held removal means to be shown at Youngs et al.'s "take off station." Concerning the

removal means he held (and appellants do not challenge the correctness of the holding): " * * * Whether this means is mechanical, as that of applicants, or manual, as that of Youngs et al., is a matter of indifference from the standpoint of patentability, in view of such authorities as in re Gill 1930 C.D. 91; also Jones v. General Fireproofing Co. [6 Cir.] 254 F. 97; 1919 C.D. 241."

It is noted that the specification of the Youngs et al. patent does not mention the "take off station" but it does recite that "the invention provides for the removal or segregation of defective articles from the system and those articles which are not imperfect by entirely automatic means free from any element of human error." It further discloses that the good articles remain on the mandrels until after they have passed the jets hereinbefore referred to where the imperfect articles were blown off their mandrels, and "may then be removed from their mandrels, by · any of several customary conventional methods such as, for example, angularly disposed revolving brushes, for packaging and shipment to the trade."

It is clear from the location of the part identified in the drawing as the "Visual inspection and take off station" that it represents the point where Youngs et al. remove the good articles from the mandrels and from the conveyor. There is no limitation in the claim which requires that both the bad and good articles be removed from the conveyor at the same point.

The "take off station" shown by Youngs et al., like the stripper system of appellants, succeeds the classifying station and is separate from it. The particular features of the stripper system are hereinafter considered in connection with claims 18 and 19.

We think it unnecessary to dwell at greater length upon the allegation that no reference discloses a classifier as distinguished from an ejector, nor a classifying station as distinguished from an ejection station, because we do not find any contention in either appellants' reasons of appeal or in their brief that such a condition of itself would render any one of the appealed

claims patentable. We assume the discussion was advanced in the brief because the alleged situation was thought to have some relation to the matter upon which appellants place most emphasis.

That matter relates to the requirement (as set forth in claim 1, supra, and specified in paragraphs (d) and (e), supra, of the examiner's analysis of that claim) for a movable classifier, or, to be more exact, "movable classifying means"—that is, movable to respective "bad" and "good" positions which correspond to the location of respective bad and good rubber articles at the preceding testing station. It will be observed that no particular structure entering into the movable classifier is set forth in the claim. So, the claim is satisfied in this respect by any classifying means movable as defined. The claim also defines the classification means as being biased to the "bad" position.

The Youngs et al. patent describes in its specification and discloses in drawings a sub-combination composed of a number of elements which, as has been stated herein, the examiner held constituted the classifying station. One of the elements composing it is a valve identified in the drawing by the numeral 44. The valve has a movable part with which three jets are opened so that compressed air is driven through the jets whereby the rubber articles found defective at the preceding testing station are blown off the mandrels as the latter, carried by the conveyor, pass the jets. The examiner held the valve so identified constituted the classifier, or classification means, of the Youngs et al. patent, pointing out that when opened the valve is moved to a "bad" position or (when not opened) remains in "good" position in accordance with the test made at the preceding testing station—that is, at the tank station.

As for the biasing of the classifying means, appellants' device biases such means to the "bad" position, while in the Young et al. patent the valve is biased to the "good" position. The examiner considered appellants' reversal of the patent plan a variation "which may be made without exercise of invention." The board expressed

the view that the matter of bias in favor of the "bad" articles "is a matter of choice rather than invention."

Another requirement of claim 1 is that the classifier be connected with electro-mechanical means, having a normally open circuit, by which means the classifier is moved to the "good" position only when the circuit is closed. The Youngs et al. patent discloses a solenoid connected with the valve which the examiner held to be the classifier. The solenoid is described by the examiner (and the correctness of his description does not seem to be challenged by appellants) as having a "normal open circuit" at a designated switch and as being connected to the valve (that is, to the classifier) "to move it to the 'bad' position when the circuit is closed." That is, as we understand it, when the circuit is open, as is normal, the valve or classifier is in "good" position and, when the circuit is closed, the valve is moved to "bad" position. The examiner said of the recital of electro-mechanical means, etc. that it "is merely repeating the statement of the reversal of operations as above noted in regard to element (d)."

In connection with the discussion of the requirement of claim 1 (see paragraph (j) of the examiner's analysis, supra) for control means operated and controlled by the testing current to close the circuit of certain electrical actuating means only when the testing current is less than a predetermined minimum (a feature named also in claims 13 and 25) the examiner said (identifying numerals being deleted): " * * * element (j) is [a] relay * * * which is operated and controlled by the testing current, or the charge remaining on the mandrel which is impressed on the grid of [a] tube * * *; and closes the circuit of [a] solenoid * * * only if the testing current which passes thru the article is more than a predetermined minimum i.e. if there is a certain amount of leakage in the article. This is the same reversal as above stated, that is closing the reject circuit if the article tests bad instead of closing the discharge circuit if the article tests good.

This reversal involves only another stage of amplification, which Youngs et al state may be done."

In a "Reply to Brief," filed before the board, the examiner elaborated upon the disclosure relative to vacuum tube amplification by the Youngs et al. patent and upon the question of biasing, citing the Braden patent as authority for the assertion that an additional amplification such as Youngs et al., taught in their specification to be feasible if desired, "is a well known characteristic of vacuum tube amplifiers." As to this phase of the case, the board said: "We are of the opinion that the amplification suggested by Youngs et al does not necessarily require reversal, but that taken with Braden, the Youngs et al suggestion is sufficient to teach a means of accomplishing reversal."

All the findings of the examiner with respect to claim 1 so far recited herein, which seem to us to be in anywise material, were either expressly or impliedly approved by the board, and we are not convinced that it erred in so doing.

Our conclusion respecting appellants' allegations concerning "ejector" and "ejector stations" has been stated and need not be repeated. The matter of the Youngs et al. patent disclosing a testing station is not in dispute. We concur in the view that the sub-combination shown by Youngs et al., under the designation "Rejector," constitutes a classifying station; that the valve identified by the numeral 44 with its attendant features constitutes a movable classifier, or, using the exact words of the claim, "movable classifying means;" that the solenoid shown by Youngs et al. meets the requirement for electro-mechanical means having a normally open circuit and connected to the classifier; that the control means operated and controlled by the testing current is taught by Youngs et al. in combination with Braden; and that the means for removing the articles from the conveyor at a station succeeding the classifying station is met by the take off station disclosed by Youngs et al.

With respect to the biasing feature, we agree that having the teaching of biasing

to the "good" position there is no invention in appellants' change to bias to the "bad" position.

Claim 13, rejected upon Youngs et al. in view of Braden, also was analyzed minutely by the examiner and applied element by element to the Youngs et al. disclosure. After applying it, the examiner said: "It is thus seen that claim 13 is readable on the disclosure of Youngs et al, including the use of an additional amplifying stage, except for the specific circuit which includes the resistor and condenser in the plate circuit of the control tube. However this device is shown to be well known in the electronic tube amplifying art, as shown by Braden, and may be substituted for the amplifying circuit as an expedient known to the worker in this art."

The board held the particular arrangement of amplifying tubes described in the claim to be "within the skill of the art as exemplified by Braden," and declared that "Proper poling or biasing of the first [the control] tube, or the use of a phase invertor appears to be a matter of choice."

We do not find any satisfactory answer to the foregoing quoted holdings of the tribunals of the Patent Office although such holdings are expressly challenged in the reasons of appeal. All that is said in that portion of the brief for appellants specific to claim 13 is: "Amongst other distinctions which need not be repeated, the last clause calls for a classifier which is operated by the main electronic tube. Neither Youngs nor Braden suggest a classifier."

The reference obviously does not refer to the circuit of the control electronic tube but to the main electronic tube.

The last clause of claim 13 reads: "* * * classifying means operated by the current which passes through said main electronic tube only when said current exceeds a predetermined minimum."

So far as a classifier not being suggested by Youngs et al. nor by Braden is concerned, we do not regard that as being a matter of any moment here. The valve of Youngs et al. hereinbefore described constitutes a classifier, and appellants have not questioned the correctness of the examiner's finding that the element under discussion is answered by the solenoid connected with the valve.

The board approved the rejection by the examiner of claims 18 and 19, the second group, upon the patent to Barton, which discloses an apparatus for testing and assorting eggs according to their weight. It said further that, "Interpreted as appellants suggest [i. e., tilting the successive mandrels to opposite sides of the conveyor to an angle convenient for loading], we see no material difference in claims 18 and 19 over the mechanism described by Youngs et al. as the 'loading station'," and rejected them upon that reference also.

It is argued in the brief for appellants (a) that the claims refer to an automatic selector or classifier and cannot be interpreted to read upon Youngs et al., and (b) that Barton does not show any tilting means to tilt one group in one direction and another group in the opposite direction.

From an inspection of one of the drawings of Youngs et al., it is clearly discernible that the mandrels, upon which the rubber articles are fitted for testing (shown in what is designated in the drawing as "Loading Station"), are tilted in different directions and at different angles. This may not be done automatically, but the tilting shown by Barton is evidently automatic.

We are not convinced of error in the board's holding as to claims 18 and 19 being rejectable on Barton.

Claim 25 is very similar to claim 1, except that it does not require means for removing the articles from the conveyor after their classification, and is obviously rejectable.

Claim 10, the only method claim, was grouped by the board with apparatus claims 1, 13, and 25 for discussion and action and also was discussed separately in connection with its rejection on Purdy in view of Hazard.

The examiner rejected the claim, first, "as drawn to the function of [the] apparatus." What the board thought of this ground of rejection is not disclosed in its decision. The assumption, under the well settled rule is that it agreed with the

examiner. See In re Boyce, 144 F.2d 896, 32 C.C.P.A., Patents, 718, 1944 C.D. 609, 568 O.G. 568, to which the board specifically directed attention in the concluding paragraph of its decision in this case, as it is happily accustomed to do in all cases appealed from it to this court.

■ In their reason of appeal 21 appellants allege that the board "erred in failing to reverse the ruling of the Examiner, which held that Claim 10 was drawn to the function of an apparatus." This assignment of error is in good and sufficient form, but it is not discussed— not even referred to directly or indirectly —in the brief for appellants before us, and the Solicitor for the Patent Office makes the point that this allegation of error must be assumed to be abandoned here.

The situation presented is practically on all fours with that which has confronted us in a number of cases, a comparatively recent one being that of In re Krasnow et al., 166 F.2d 196, 198, 35 C.C.P.A., Patents, 939, at page 942, where we said: " * * * While in their notice of appeal the proper reasons of appeal were assigned to the board's holding in respect to those patents, those reasons may not be relied upon because they were not discussed in the brief and are assumed to be abandoned here. In re McCabe, 90 F.2d 111, 24 C.C.P.A., Patents, 1224."

Under the well established rule the rejection of the claim as being drawn to no more than the function of the apparatus must be sustained.

The claim was rejected also by the examiner upon Youngs et al. and upon Purdy in view of Hazard, and those rejections were expressly approved by the board but it is unnecessary for us to review them in view of our conclusion upon the functional question.

■ Appellants' invention—they evidently have an invention as evidenced by allowed claims—is in a technical mechanical field. The rejected claims obviously have received the careful study of experts in the Patent Office. From our study of them, we are not convinced that their rejection was erroneous.

The decision of the board is, therefore, affirmed.

Affirmed.