37 C.C.P.A.(Patents)

**Application of BOOGE et al.**
**Patent Appeals No. 5651.**

United States Court of Customs
and Patent Appeals.

Argued Nov. 15, 1949.

Decided Feb. 2, 1950.

---

John P. Hancock, Wilmington, Del., for appellants.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges.

JOHNSON, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting all of the claims, 1 to 5, inclusive, in appellants' application for a patent relating to "Titanium Oxide Pigment Production."

The development in issue is the production of improved titanium dioxide pigments said to be characterized by optimum particle size, high hiding power, tinting strength, and advanced weathering durability. Titanium dioxide is an old and important commercial pigment, useful in its anatase and rutile crystalline modifications. The latter form has more desirable pigment properties than the anatase, but conversion to the rutile form by calcination at high temperature has not been altogether satisfactory because of consequent increased particle size and lowered hiding properties from the optimum capacity of the rutile. Appellants assert that the rutile TiO₂ pigment produced by their process exceeds by at least 25% the hiding power and tinting strength of the anatase pigments with the added desirability of improved color and durability properties.

In their specification appellants tabulate data said to depict the color, hiding power, tinting strength, and chalking properties of TiO₂ pigments produced by prior art processes, and discuss the disadvantageous aspects of those products. It is noted that the pigments tested were the products of Patents 1,892,693; 2,224,777; and, 2,253,551. The product obtained from Patent 2,062,-133, is also discussed. Appellants then state that it is among the objects of their process to overcome the disadvantages which have characterized prior rutile pigment production, and to provide a novel method and combination for their attainment. The basic references cited against appellants by the Patent Office tribunals are listed below. It may be stated that Olson and Barksdale are later in point of time than those mentioned above, as are two additional references cited, Patterson and Peterson. None of the patents discussed in appellants' application are cited as references herein. Peterson, 2,369,246, Feb. 13, 1945; Olson, 2,342,483, Feb. 22, 1944; Barksdale et al., 2,285,485, June 9, 1942; Patterson, 2,296,618, Sept. 22, 1942; Erskine, 2,218,704, Oct. 22, 1940; Hanahan et al., 2,212,935, Aug. 27, 1940.

Appellants' process consists essentially of the following steps:

(1) Hydrolyzing titanium sulphate solution in the presence of an activated seeding or TiO₂ nucleating agent, effecting the precipitation of a form of anatase TiO₂;

(2) Purifying the resulting suspension by customary methods to remove color imparting impurities; treating the purified or washed product with an admixture of a small amount of sodium and potassium sulphate, or other soluable alkali metal salt, and a small amount of zinc oxide; and calcining the treated product at a temperature range of 800°–950° C.;

(3) Grinding the resulting calcined product to eliminate coarse gritty particles;

(4) Treating with a small amount of a mixture of the hydrous oxides of aluminum, silicon, and titanium, which precipitates the white hydrous oxide thereof onto the finely divided pigment; and

(5) Filtering, drying, and pulverizing the pigment.

Claim 1 is illustrative, and reads (for convenience in understanding the subject matter, the claim is quoted in segments):

"1. A process for obtaining a rutile titanium oxide pigment of improved tinting strength and durability properties,

which comprises hydrolyzing an anatase-yielding titanium salt solution in the presence of a small amount of a separately-prepared activated seeding agent which, after heating to temperatures ranging from

100–550° C., exhibits, on X-ray analysis, the diffraction pattern of rutile,

and which is adapted to precipitate during the hydrolysis an anatase hydrolysate which will convert to rutile upon calcination at a temperature below substantially 1000° C.,

purifying the recovered hydrolysate and calcining the purified product in the presence of a small amount of a soluble alkali salt and a zinc compound selected from the group consisting of zinc oxide and a compound of zinc which yields zinc oxide upon calcination, at a temperature ranging from above 800° C. to about 950° C.,

grinding the resulting product to effect removal of coarse, gritty pigment particles,

precipitating a white, hydrous oxide of an amphoteric metal selected from the group consisting of aluminum, silicon and tin onto the finely-divided pigment,

and then drying, finishing and recovering the final product."

With respect to the steps of appellants' process, Olson teaches the following:

(1) The hydrolysis of titanium sulphate in the presence of a nucleating agent comprising both yield and rutile inducing nuclei components "which when subjected to X-ray analysis following heat treatment at temperatures ranging from above 100° C. and up to, say, about 550° C., exhibit a rutile diffraction pattern ranging from about 10 to 95 or 100%," which effects the precipitation on an anatase form of TiO₂ which will readily convert to rutile when calcined at temperatures below 1000° C.;

(2) After conventional washing and purification treatments, calcining the anatase hydrolysate at temperatures ranging from 850° C. to 975° C., the calcination preferably being conducted in the presence of a small amount of sodium and potassium sulphate. The examples given by Olson show that the step of treating the anatase hydrolysate with the alkali salts, such as sodium and potassium sulphate, occurs prior to the calcination. Thus far it will be seen that the teaching of Olson is identical with appellants' step 2. However, appellants teach the use of a small amount of zinc oxide with the sodium and potassium sul-

phate with which the anatase hydrolysate is treated before calcination. Olson teaches: " * * * I contemplate producing in accordance with the invention TiO₂ pigments containing prime pigments, such as zinc sulfide, * * * zinc oxide * * *, which either have been precipitated upon, coprecipitated with, or blended with the titanium oxide during its manufacture, processing or finishing." That statement adequately describes the step of including zinc oxide in the process of manufacturing the TiO₂. It does not seem that invention would be involved in deciding to add it just before the calcination step.

(3) The calcined product then undergoes the "usual finishing treatments, such as wet or dry grinding processing."

(4) Olson does not disclose appellants' step 4.

(5) This step, not explicitly disclosed by Olson, is thought to be obvious.

From a comparison of Olson's teaching with appellants' process, it will at once be seen that Olson discloses the entire process, so far as any explicit disclosure is necessary, save appellants' step 4. But that step is not new, as will presently appear.

The Hanahan et al. patent is directed to improving titanium pigments so as to be weather and chalk resistant, and the patentees teach the addition of *aluminum* sulphate to a water slurry of calcined TiO₂, precipitating the aluminum onto the pigment in the form of a hydrated oxide by adjusting the pH of the slurry to neutrality by the addition of an alkaline earth metal hydroxide as a neutralizing agent. Hanahan et al. teach that the TiO₂ pigment may be so treated at any convenient point, after calcination.

Erskine teaches the treatment of titanium oxide pigment with a hydrate or oxide "of any of the metals of the first sub-group of group IV or the metals of group V of the periodic table of elements, the soluble salts of which are easily hydrolyzed in acid or alkaline solution and form insoluble, colorless, or white hydrous oxides." The soluble salt selected, preferable *titanium* or zirconium sulphate or chloride, is added to a slurry of TiO₂ and precipitated by suitable

means. The treated pigment is then washed, dried, and pulverized. Erskine teaches that his process increases the chalk resistant properties of the resulting pigment product.

Patterson has as an object of his invention the production of titanium pigments having greater weathering resistance and he teaches the addition to a slurry of calcined $TiO_2$ pigment of a water soluble alkali metal *silicate*, adding a soluble compound of a second group metal—as, for example, barium—thereby precipitating the silicate with the pigment. The treated pigment is then filtered, washed, dried, and ground.

Barksdale et al. disclose a process of hydrolyzing titanium sulphate solutions with a nucleating agent, washing the resulting precipitated hydrous titanium dioxide calcining it at 800° C., and pulverizing the calcined product. An improved tinting strength is secured by the Barksdale et al. process.

Olson and Barksdale et al. teach appellants' steps 1, 2, 3, and 5, while Hanahan et al., Erskine, and Patterson teach steps 4 and 5. The examiner, with the board affirming, rejected claim 1 on that basis.

Appellants assign that holding as error, and before us seek to distinguish their process from the cited art as follows: neither Olson nor Barksdale et al., it is contended, teach the "requirement" recited in appellants' claim 1 that the calcination take place in the presence of a small amount of zinc oxide *in addition to* the soluble alkali metal salt. We have pointed out above in the description of Olson's process, (2), that he teaches the precipitation upon or *blending with the $TiO_2$ during its manufacture or processing* of zinc oxide. Appellants contend, however, that "no amount of zinc oxide is specified nor is there any teaching in this reference that small amounts of zinc oxide, together with a small amount of the alkali metal salt, must be present during the calcination." Appellants' claim 1 itself does not specify an *amount* of zinc oxide. The claim reads: " * * * in the presence of a small amount of a soluble alkali metal salt and a zinc compound * * *." To specify clearly a small

amount of a zinc compound, the claim should have read: "in the presence of a small amount of a soluble alkali metal salt and *of* a zinc compound." As written, the claim is not limited to a *small amount* of a zinc compound, but reads, in effect: "in the presence of a small amount of a soluble alkali metal salt and in the presence of a zinc compound." Furthermore, we have searched the record in vain to find a teaching that the use of zinc oxide in the appellants' calcination step is responsible for any surprising or novel result beyond that to be anticipated by the routine knowledge of one skilled in the art informed by Olson that zinc oxide might be used with the $TiO_2$ during its manufacture or processing. Appellants do state in their specification that "It will be found essential in the practical application of this invention and in procurement of its beneficial effects that one observe certain critical factors and utilize the novel combination of process steps mentioned. * * * Likewise, if the conditions of calcination specified are not resorted to, an impairment in pigment quality will ensue." But appellants do not lay any foundation in the record for considering the use of zinc oxide, beyond the manner known to the art and suggested by Olson, as critical to the "optimum results" to be achieved. Indeed, the record does not reveal that any result is achieved beyond that to be expected by an artisan combining the basic developments of the references. Where Olson and Barksdale et al. teach steps 1, 2, 3, and 5 of appellants' process for an improved $TiO_2$ pigment, and Hanahan et al., Erskine, and Patterson teach that $TiO_2$ pigments may be further improved by step 4, we cannot agree with appellants that it is inventive to use a process embracing steps 1, 2, 3, 4, and 5.

Of the remaining claims, 3 recites "precipitating a small amount of a white hydrate of an *amphoteric metal* on the wet ground material," and 4 includes "precipitating on the wet ground material * * * white hydrous oxides of *amphoteric metals*" [emphasis supplied], whereas the specification speaks of "an amphoteric metal from the group consisting of aluminum, silicon, titanium and tin." The ex-

aminer rejected claims 3 and 4 as being too broad in omitting to recite the Markush grouping of claims 1 and 2, "an amphoteric metal selected from the group consisting of aluminum, silicon and tin." The Board of Appeals made no explicit reference to that ground of rejection, but called attention to the necessity of including on appeal all grounds of rejection in the Examiner's Statement not expressly overruled by the board, under the rule of In re Boyce, 144 F.2d 896, 32 C.C.P.A., Patents, 718. That constitutes an agreement by the board with the examiner's ground of rejection. Application of Cremer et al., 173 F.2d 376, 36 C.C.P.A., Patents, 980, 990. In their reasons of appeal, appellants assigned no error to that rejection of claims 3 and 4. Our jurisdiction on appeals from the Patent Office tribunals is expressly limited to the points set forth in the reasons of appeal. R.S. § 4914, 35 U.S.C. 62, 35 U.S.C.A. § 62. We cannot reverse the board on a ground of rejection assigned as error in the appellants' reasons of appeal, where another ground equally controlling goes unchallenged. Application of Dalzell et al., 148 F.2d 357, 32 C.C.P.A., Patents, 938; In re Scharf, 155 F.2d 734, 33 C.C.P.A., Patents, 1079.

Claims 2 and 5 remain. They differ from claim 1 in reciting temperature ranges and specific amounts or percentages of the materials to be used in the process. Claim 2 calls for calcining the precipitate until at least 90% rutile is present in the calcined product. Olson teaches calcination until 90–100% rutile is present; Peterson does likewise.

Claim 5 specifies 170–200 g. TiO₂ per liter with 2–5% of the seeding agent present during the hydrolysis (appellants' step 1); mixing the purified product (in step 2) with from 0.5% to 2% of a mixture of sodium and potassium sulphates and the same percentage range of zinc oxide; using 1–3% of the hydrous oxides of aluminum, silicon, and titanium in step 4. Olson teaches the use of 200 and 250 g. TiO₂ per liter; Barksdale et al., 150 g., or a range from 80 to 200 g. TiO₂ per liter. Barksdale et al. disclose 4 to 5½% for the nucleating composition; Olson teaches that usually "the total amount of nuclei complex used ranges from about .3% to 5%," on the basis of the TiO₂ to be hydrolyzed, and "the amount of rutile-forming constituent may range from .1% to 5%." Appellants' 0.5 to 2% of sodium and potassium sulphate is met by Olson teaching 1% of potassium or potassium and sodium sulphate, or by Peterson's disclosure of "the preferred 0.5% to about 2% concentrations of alkali metal salts." The appellants' 0.5% to 2.0% zinc oxide is met by Peterson's teaching of an amount of zinc salt equivalent to 0.5% to 2% zinc oxide. The final limitation of appellants' process, 1–3% of the hydrous oxides of aluminum, silicon, and titanium is met by Hanahan et al. teaching the use of 0.02 to 2% of aluminum oxide; Patterson, 0.5 to 10%—preferably about 5%— of silicate; and Erskine, 0.5 to 5.0% of titanium oxide. The board agreed with the examiner that claims 2 and 5 were unpatentable in view of the references. From the foregoing it will be seen that the specific recitations of the claims are adequately disclosed in the prior act. The basic claim, 1, being unpatentable over the references, claims 2 and 5 do not add any limitations which would transform old art into a patentable process.

Appellants contend that In re Huntzicker, 90 F.2d 366, 24 C.C.P.A., Patents, 1325, and In re Walker et al., 135 F.2d 1015, 30 C.C.P.A., Patents, 1072, are authority for reversal here despite the references. "Even if all of the steps recited in the claims should be old in the references," [which appellants do not admit] urges counsel, "the absence of any suggestion in such references that a new, useful and commercially-successful process might be obtained by combining their teachings, renders the claimed process combination patentable." That statement does not meet the facts at bar. First, there is, if there were any doubt as to patentability, no proof of commercial success in the record, and we will not rely on the mere statement of it. Application of Yount, 171 F.2d 317, 36 C.C.P.A., Patents, 775. If there were proof of commercial success in the record, we would not be influenced by it here, as patentability is not in doubt. In re Gillette,

175 F.2d 787, 36 C.C.P.A., Patents, 1172. Second, there is no "absence of suggestion," in the art to do what appellants have done; the process is not new. Olson and Barksdale et al. teach steps 1, 2, 3, and 5 of appellants' process, and Hanahan et al., Erskine, and Patterson teach that one seeking to improve pigments, such as that produced by steps 1, 2, 3, and 5, may do so by their process, which is step 4. It is not invention for appellants to add step 4 to the others. The cited cases are inapposite. To grant a monopoly to appellants for their process which merely combines steps of well defined processes in an active art would be to deny to those skilled in the art the opportunity to practice without tribute that art which would otherwise be their right when the cited references expire. Application of Martin, 154 F.2d 126, 33 C.C.P.A., Patents, 842.

It follows from what we have said that the decision of the Board of Appeals must be affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case, and did not participate in the decision.