**Application of LE BARON.**
**Patent Appeal No. 6082.**

United States Court of Customs
and Patent Appeals.
June 15, 1955.

Ernest V. Haines, Skokie, Ill., and Edward S. Irons, Washington, D. C. (James P. Burns, Washington, D. C., of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (Clarence W. Moore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

GARRETT, Chief Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, rejecting certain claims of appellant's application, serial No. 117,060, filed September 21, 1949, for "Phosphorus Compound and Process of Producing Same." The Board of Appeals had before it claims Nos. 25–35, inclusive, which claims for reasons of form had been substituted for the claims rejected by the Primary Examiner. No claims have been allowed.

Claims 25–30, inclusive, are process claims, and claims 31–35, inclusive, product claims. The Board of Appeals affirmed the rejection by the examiner of the product claims (Nos. 31–35). No appeal has been taken to this court from that rejection. With regard to the process claims (Nos. 25–30), the board refused to sustain the rejection upon one of the grounds upon which the examiner based his decision, but the board affirmed the rejection upon the other grounds. Appellant appeals from this latter decision only.

Claim 25 is illustrative, and reads as follows:

"25. A process of preparing phosphates which comprises introducing, for quick fusion, an at least partially defluorinated superphosphate, prepared by calcination at a temperature below its fusion temperature, into a mass of said material being maintained in the molten state at temperatures below volatilizing temperatures for phosphorus constituents, removing at least a portion of said molten mass when homogeneous and quenching the removed portion within at least ten seconds after its removal from the molten bath."

The references which were cited by the Board of Appeals are the following:

| | | |
|---|---|---|
| Tromel | 2,093,176 | Sept. 14, 1937 |
| Franck et al. | 2,183,379 | Dec. 12, 1939 |
| Butt | 2,442,969 | June 8, 1948 |
| Maust | 2,446,978 | Aug. 10, 1948 |
| Schilling | 2,539,638 | Jan. 30, 1951 |

Curtis et al.—Industrial and Engineering Chemistry, Vol. 29, No. 7, July 1937 pp. 766–770, "Fertilizer from Rock Phosphate."

The principal reference so far as we are here concerned is the patent to Tromel, the rejection of the appealed claims having been based by the board upon Tromel alone, or upon Tromel in view of Schilling. The patent to Maust and the article by Curtis et al. were used as auxiliary references. The patents to Butt and Franck et al. were not relied upon by the board in the rejection of the claims here involved, but the Solicitor for the Patent Office suggests that they may be useful in arriving at an understanding of the general subject matter to which the claims are directed. In view of the limited issues which have been presented to this court, an exhaustive discussion of the references is not deemed necessary.

Appellant's application is directed to a method of producing from "phosphate rock"[1] a phosphorus compound (primarily tricalcium phosphate) suitable for use as an animal feed supplement. Some of the references have the same object, while the others are primarily concerned with the production of phosphates to use as *fertilizer*. Although appellant points out these different objects, it does not seem that there is any difference in the processes directed to these two objects which would have any bearing on the patentability of the present process, and appellant does not seem to so claim.

Apparently, in so far as we can determine from the record, phosphate rock in its natural state is not satisfactory for use either as a feed or as a fertilizer, and it is usually further treated before use. Some of the procedures involve treatment with various types of acid, and "calcination" or roasting. In appellant's specification we are told that it is necessary to reduce the amount of flourine which is in the natural rock to extremely low percentages in order to use the rock to best advantage. Apparently large amounts of the flourine are removed by the acid treatment and calcining steps, but enough remains to cause serious difficulties in animal feeding. We are also told in the specification that it is desirable to obtain as high a percentage of the *alpha* crystalline form of tricalcium phosphate as possible, because the *alpha* crystalline form has its phosphate, $P_2O_5$, in a more "available" state than the natural rock, i. e., it can be more readily absorbed by the animals.

The process described in the application involves melting the phosphate rock either before or after previous acid treatment or calcining steps, and then "quenching" the molten rock immediately. This process is said to reduce the amount of flourine to negligible amounts, and to maximize the *alpha* form of tricalcium phosphate.

1. The Curtis et al. article states in a footnote: "The term 'rock phosphate' is used to distinguish the amorphous phosphates, such as occur in the deposits in Tennessee and Florida, from the 'mineral phosphates' of definite chemical compositions, such as fluorapatite, phosphorite, etc."

It is apparent from the specification that appellant thought he was the first to develop the quenching step, and it was strongly emphasized in the application and its prosecution below for its efficacy in obtaining the *alpha* crystalline form. The Board of Appeals refused to treat this step of appellant's process as being inventive, stating, "Quick quenching of Tromel's product seems to us to be wholly uninventive since this is a known expedient in the art to preserve the tricalcium phosphate in the alpha form. Schilling discloses the expedient and it is further illustrated by Maust, * * * and the Curtis et al. article, * * *." The ground of rejection of the examiner which was overruled by the board related to a particular combination of references thought to show the unpatentability of this quenching step. Although appellant's reasons of appeal are general in form, alleging that the "Board of Appeals erred in affirming the Primary Examiner's rejection upon [references]," the brief in behalf of appellant before this court does not controvert nor discuss at any length the board's holding with respect to the unpatentability of the *quenching* step recited in the claims. It follows that appellant must be deemed to have abandoned any claim of patentability for this quenching step. In re Cremer, 173 F.2d 376, 36 C.C.P.A., Patents, 980, 990. In re Dalton, 188 F.2d 170, 38 C.C.P.A., Patents, 953, 955.

Thus, the only question before this court is whether there is invention in "introducing, for quick fusion, an at least partially deflourinated superphosphate, * * * into a mass of said material being maintained in the molten state * * *." Appellant argues that this is "the critical and distinguishing step of the claims here on appeal." In his brief appellant states,

"The above defined critical step effects substantially instantaneous fusion of the phosphate rock whereby the flourine is almost completely removed therefrom. Gradual heating of the phosphate rock to the fusion temperature, as in the prior art does not achieve the same result as that obtained by appellant. Gradual heating of the phosphate rock to the fusion temperature yields, even after a prolonged period of maintenance of the rock in the molten state, a product which contains on the order of ten times as much flourine as that resulting from the method embraced by the appealed claims. Since it is the flourine content which is the limiting factor on the *quantity* of a particular phosphate material which can be used as an animal feed supplement, the significance of the appellant's invention is apparent." [Italics quoted.]

The tribunals below were mainly concerned with the patentability of the product claims, and with the patentability of the quenching step of the process, and consequently relatively little is said on the precise issue now before this court, whether the manner of *melting* the rock is inventive.

In an examiner's letter dated January 16, 1952, which finally rejected appellant's claims, the following is stated:

"Applicant now argues that the manner of melting the phosphatic charge is critical and inventive. The material to be melted is introduced into a molten bath of the material. This appears to be merely a convenient and obvious manner of melting a charge and cannot be considered inventive. Note Chalmot of record, for example, which shows solid phosphatic material introduced into a body of molten material. Moreover, the present specification does not support the contention that the particular manner of melting the charge is essential, but merely states that the preferred method is a convenient way of operating."

The Chalmot reference referred to by the examiner is not in the record, and cannot of course, be considered by us.

The "Examiner's Statement" made upon appeal to the Board of Appeals does not treat specifically the question of

whether there is invention in the quick fusion as defined by the claims.

The decision of the Board of Appeals contains the following statement:

"* * * We believe that the Tromel two stage procedure involves a fusion sufficiently rapid to come within the terms of the appealed claims due to the introduction of the heated rock from the first zone into the second or fusion zone. The latter would contain material maintained in the molten state. The claims contain no correlation between the amount of rock entering and the amount maintained in the molten pool."

█ Although the Board of Appeals appears to have rested its affirmance on a showing of the step in the Tromel reference, under well settled law, the examiner's grounds of rejection are deemed to have been affirmed by the board in the absence of a specific reversal. In re Dreshfield, 110 F.2d 235, 27 C.C.P.A., Patents, 1013.

The principal contention by appellant is that Tromel is an ineffective reference on the ground that it does not show the introduction of the unmelted material into a molten pool of the same material. Tromel shows a two stage process where the rock is heated to a temperature just short of fusion in the first stage, and then is led into a second stage where the temperature of the furnace is above the fusion temperature. There is no statement in Tromel that there is an actual *pool* of molten material in the second stage. Although the board thought that the second stage would necessarily contain a pool of molten material, a reading of the "Examiner's Statement" gives the impression that its author may have thought that there was *no* such pool. Appellant argues that such conflicting interpretations destroy Tromel as a reference.

We do not consider it necessary to decide here whether or not Tromel shows the particular manner of melting which is claimed herein. Tromel as well as Schilling shows the melting of phosphate rock to remove flourine, and in order to prevail here, appellant must show that this method of melting is *critical*.

We cannot regard the statement in the claim that the fusion is "quick" as defining a critical step, independently of the method of attaining such "quick fusion." How quick is "quick"? That certainly cannot serve to distinguish appellant's method from that of the prior art. As is pointed out by the brief in behalf of the Commissioner of Patents, the time of Tromel's melting operation is one half hour, while the "average holding time" of the fused material in appellant's furnace is about one hour, and so "Tromel's fusion is necessarily 'quick'."

Furthermore, we do not regard the specification that the quick fusion results from introducing unmelted material into a molten pool of the same material as going any further toward defining a critical step. The time required by such fusion would be necessarily dependent upon the relative quantities of the molten mass and the unmelted mass, and upon the temperatures of each. We are unable to discern that the fusion attained by the method of the claims would be substantially quicker than the fusion of the prior art, or even that it would be quicker. Such a situation precludes a finding of criticality by this court in the face of the rejection below.

Perhaps the most damaging objection to a finding of criticality in the appellant's method of melting is that made by the Primary Examiner, that the specification itself negatives criticality in the melting step. Appellant's specification states that *completely* deflourinated material may be used in the process; that the temperature of the material "is not critical provided it is in the molten condition, nor is it critical with respect to the length of time under which this material is maintained in a molten condition so long as it is completely and entirely processed into a molten condition"; that the longer the molten material is maintained in the molten state, the lower the flourine content will be; that the feed materials should be placed in a molten

state or condition "by heating the material to a molten state"; and that this is *"generally done" "economically"* in a reverberatory furnace or other vessel having a large pool of previously molten material. (Emphasis added.) One of the two examples in the specification stated that a "pool of molten material was maintained in the furnace," while the other stated only that the unmelted material "was then melted and fused at a temperature of about 1500°C."

It is apparent that appellant in his specification considered fusion attained by the introduction of unmelted material into a pool of molten material as the equivalent of fusion attained by any other method. So treating the process in his specification, he cannot now be heard to claim that it is critical. In re Field, 174 F.2d 128, 36 C.C.P.A., Patents, 1035; In re Bloomer, 178 F.2d 407, 37 C.C.P.A., Patents, 770; In re Gardiner, 171 F.2d 313, 36 C.C.P.A., Patents, 748; In re Borcherdt, 197 F.2d 550, 39 C.C.P.A., Patents, 1045; In re McCarn, 212 F.2d 797, 41 C.C.P.A., Patents, 905, and cases cited therein.

There remains to be considered only an affidavit introduced by appellant, after the final rejection but before the hearing before the Board of Appeals. The board in its opinion stated:

"Appellant requests us to consider an affidavit under Rule 132 [35 U.S. C.A.Appendix] filed July 14, 1952 although it has not been commented upon by the Examiner. This affidavit compares the flourine content resulting from quick fusion of phosphate rock (.003%) with that obtained by slow fusion in a reverberatory furnace (.041%). We do not find that this affidavit has any bearing on the rejections which we have sustained; consequently we find no occasion to take any further note thereof."

Appellant has assigned this holding of the board as error. The affidavit compared the flourine content left after treating a partially deflourinated phosphate rock by appellant's process, with the flourine content remaining after uncalcined phosphate rock was subjected to a "slow fusion process." As is pointed out by the Solicitor for the Patent Office, "The comparison, of course, should have been between appellant's quick fusion process and the quick fusion process of Tromel." We are of the opinion that the board was correct in holding that the affidavit has no bearing on the case. Even giving full credit to the affidavit, it cannot show that appellant's method of melting is critical over those shown in the prior art now before us.

Since appellant has not demonstrated that his method of melting phosphate rock is critical and distinguishes over the prior art, it follows that the decision of the Board of Appeals must be affirmed.

Affirmed.