50 CCPA
## Application of Paul DIEDRICH.
### Patent Appeal No. 6978.

United States Court of Customs and Patent Appeals.
June 20, 1963.

Michael S. Striker, New York City, and Harold D. Steinberg, for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals which affirmed the examiner's rejection of claims 6, 10, 13–16, 19, 21 and 26–32 of appellant's application [1] entitled "X-Ray Contrast Media" on the ground that appellant's application is not entitled to the filing date of his parent application,[2] and through it to the benefit of the priority date of his German application.[3] No claims have been allowed.[4]

The invention relates to certain new compounds which are the derivatives

---

1. Serial No. 485,821, filed February 2, 1955.

2. Serial No. 406,335, filed January 26, 1954.

3. Sch 11,647 IVc/12q, filed February 5, 1953.

4. Both product and process claims are involved here. In In re Novak and Hogue, 306 F.2d 924, 49 CCPA 1283, we said: "The following statement made by this court in In re Lorenz and Wegler, 305 F.2d 875, 49 CCPA [1227]—[No. 6787], is pertinent here: 'The examiner and the board made no distinction between the product claims and the process claims as to the ground of rejection. While appellants filed reasons of appeal which would justify our separate consideration of both groups of claims, we construe appellants' brief to be an abandonment of any issue as to the legality of such a rejection of the process claims. Our decision is thus necessarily limited to a consideration of the rejection solely on the validity of the rejection of the product claims. In re Le Baron, 223 F.2d 471, 42 C.C.P.A. 956; and cases cited therein; and L. & C. Hardtmuth, Inc. v. Fabrique Suisse De Crayons Caran D'Ache S.A., 287 F.2d 599, 48 C.C.P.A. 873." For the same reasons we do not consider the rejection of the process claims here.

of 3,5-diamino-2,4,6,-triiodo-benzoic acid which are said to be useful as X-ray contrast media, and the production of those compounds. The disclosure states:

"* * * These compounds are particularly suitable for urography and are especially useful by the intravenous application of their salts as renal contrast media. As in the case of most of the known renal contrast media the derivatives of the present invention are also suitable for the other types of roentgenographic purposes such as cystography, hysterosalpingography, cardiography, angiography, fistulography, and the X-raying of any other hollow viscera."

Claim 6 is representative and reads:

"6. A derivative of 3,5-diamino-2,4,6-triiodo-benzoic acid having the following structural formula:

wherein each R group is a lower aliphatic carboxylic acid acyl radical."

All the claims were rejected by the examiner either as unpatentable over or as fully met by Sterling.[5] In response to appellant's contention that Sterling is not properly available as a reference because the effective date of appellant's application antedates it, the examiner held that appellant is not entitled to the filing date of his German application because his parent application "does not disclose a complete invention since it lacks an adequate disclosure of utility." The board affirmed, agreeing that appellant's parent application had failed to meet the requirements of 35 U.S.C. § 112.

The parties stipulate that if appellant is not entitled to the filing date of his parent application, and through it to the filing date of his German application, his claims are unpatentable over the Sterling patent. Thus it is unnecessary for us to consider Sterling.

The board noted that appellant's parent application became abandoned as a result of his failure to respond to the first official action on that application, in which action the examiner rejected all the claims on the ground that the application contained an insufficient disclosure of "the manner in which the claimed compounds were to be used." We need not inquire into the reasons why appellant permitted his parent application to become abandoned, or why he filed the instant application in its stead.

35 U.S.C. § 120 requires that before an applicant is entitled to the benefit of a previously filed application, that application must comply with "the first paragraph of section 112." Hence, the specific question is whether appellant's parent application, upon which he must first rely to be entitled to the priority date of his German application, is sufficient to have enabled one skilled in the art to practice the invention here claimed at the time it was filed, as required by 35 U.S.C. § 112.

Appellant's parent application is broader than his German application. The pertinent portions of the former read:

"The present invention relates to the production of new and useful derivatives of 3,5-diamino-2,4,6-triiodo-benzoic acid.

"* * * This acid is however relatively unstable and decomposes upon storage as the dry substance or in solution, forming dark greasy products, so that the acid must be directly used for technical or pharmaceutical purposes or else be lost.

"It is therefore an object of the present invention to provide new and useful derivatives of 3,5-dioamino-2,4,6-triiodo-benzoic acid which de-

rivatives are stable and are useful for technical and pharmaceutical purposes.

\* \* \* \* \* \*

"The present invention further comprises as new and useful products, esters and non-toxic salts of the above composition. \* \* \*

\* \* \* \* \* \*

"It has been found that despite the instability of 3,5-diamino-2,4,6-triiodo-benzoic acid the acyl derivatives thereof according to the present invention are very stable, particularly so with the diacyl derivatives, and the compounds are color stable and remain so even upon standing. These compounds, besides their stability, possess additional valuable properties which make them useful for technical and pharmaceutical purposes, namely the fact that their salts are relatively water-soluble and that the compounds have a high iodine content with the iodine in stable connection to the compound."

In substance, the parent application states that the claimed compounds are useful for "technical and pharmaceutical purposes," and that they possess certain *properties*, viz, high iodine content in a relatively stable bond, lack of color, and that their salts are non-toxic and relatively water-soluble.

The board made the following evaluation of that disclosure:

"If the use to which appellant's compounds were adapted was clearly obvious, which we do not believe to be true, appellant apparently did not recognize this specific use since in the \* \* \* prior United States application he did not disclose this use. In the prior German patent he did not disclose even the *possibility* of using any claimed compound in a specific use although he referred to the *possibility* of use in fields so broadly defined as to, perhaps, include any subsequently discovered use. Appellant, therefore, left to surmise and speculation the question of whether this compound had properties that would render it useful as a dye intermediate, as a compound for the treatment of thyroid gland malfunction, as an X-ray contrast agent, or as an agent in any of the uses which its chemical structure might suggest a possibility of usefulness.

"*We do not believe that it was the intention of the statutes to require the Patent Office, the courts, or the public to play the sort of guessing game that might be involved if an applicant could satisfy the requirements of the statutes by indicating the usefulness of a claimed compound in terms of possible use so general as to be meaningless and then, after his research or that of his competitors has definitely ascertained an actual use for the compound, adducing evidence intended to show that a particular specific use would have been obvious to men skilled in the particular art to which this use relates. \* \* \*" (Last italics supplied.)

It is evident, and appellant does not deny, that neither the German application, nor his parent application, has any *specific* disclosure as to just *how* the compounds are to be *used*. It is appellant's position, however, that the statement that the compounds are useful for pharmaceutical purposes,[6] taken together with the disclosure of certain properties, viz, stability, heavy iodation, non-toxicity and water-solubility of the salts, is sufficient to teach one skilled in the art "that the compounds could and should be used as X-ray contrast agents."

While it is true, as appellant states, that the disclosure is directed to those skilled in the art, it must be remembered that section 112 also demands that such disclosure of the invention

---

6. No reliance appears to be placed on the term "technical" use.

must be "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to * * * use the same." Those clear and express requirements are not met when one skilled in the art must experiment at great length before he can use the invention. It seems to us that such a situation is present here.

Appellant cites numerous patents which disclose compounds more or less similar to his, as being useful for X-ray contrast agents. In evaluating those patents the board stated:

" * * * these patents do not support appellant's contention that the disclosure of either German application Sch 11,647 IVc/129 or United States application Serial No. 406,-335, at the time either was filed would inform such a man [a person of ordinary skill in the art] that the claimed compounds were actually useful as X-ray contrast agents. The Allen patent No. 2,677,645 points out (column 1, lines 6 to 35) some of the characteristics besides water-solubility and stability that are required in an X-ray contrast agent. Olsson patent No. 2,704,270 refers to some of the undesirable secondary effects from the intravenous injections of water-soluble X-ray contrast media containing 3,5-diiodo-4-pyridon-N-acetic acid salts, including bouts of coughing and sneezing, flashing of the face and neck, decrease in blood pressure, vomiting, lacrymation, salivation, urticaria, shock effect and cyanosis, and even death. The Papa et al. patent No. 2,790,748 points to the fact that the amino or hydroxyl groups attached to the halogen-carrying aromatic ring of X-ray diagnostic agents for gall bladder visualization are 'in many cases undesirable, as they are responsible for certain side reactions.'

"Considering the other patents cited by appellant, we find no support for the proposition for which they were cited. We do not find in them any suggestion that stable, water-soluble, heavily iodinated compounds of the structure claimed would be understood to be so free of undesirable or dangerous side effects that a disclosure such as that of appellant's prior United States and German applications would be recognized by the man of ordinary skill as having the indicated specialized utility."

In addition, the solicitor directs our attention to a variety of other stable, highly iodinated, non-toxic, water-soluble compounds which are *not* X-ray contrast agents.

We note that the Galler patent,[7] cited by appellant, shows that X-ray contrast agents are known which are not water-soluble, and which are unstable. Similarly, Allen,[8] likewise cited by appellant, shows that suspension as well as aqueous solutions of contrast agents are used

---

7. U. S. Patent No. 2,613,172, issued October 7, 1952, states:

"Water insoluble X-ray contrast agents have been heretofore proposed for use in delineating structures of the animal body as well as human, and also in delineating structural details in inanimate objects, such as defects in metals, by impregnating or filling or enclosing the structures with the contrast agent and then taking appropriate X-ray photographs. These compositions are unstable and release free iodine which is objectionable in the treatment of tubercular patients, for example. Again, because of the unstability of these compositions, they cannot be sterilized without material decomposition. Moreover, these compositions have not been too successful because of their highly viscous nature. This lack of fluidity is particularly objectionable in that when these compositions are injected in humans or animals, their slow rate of flow deters wide-spread application. To obviate this difficulty, emulsions have been suggested, but this expedient renders the medium less opaque and materially reduces the effectiveness of the agent as an X-ray contrast composition."

8. U. S. Patent No. 2,677,645, issued May 4, 1954.

Additionally, Allen shows that properties in addition to those described by appellant, such as slow diffusibility and absorption, adequate wetting power and quick elimination from the region of administration after the X-ray examination, are requirements which an X-ray composition must have "before it could safely and reliably be employed for the stated purpose." Nowhere does Allen stress the need for stability of his iodinated X-ray contrast agent. Nowhere in the parent disclosure has appellant mentioned that his compounds possess the property of being opaque to X-ray photographs, the property most crucial to the use for which he now contends.

Under such circumstances we cannot see how reference to those patents, cited more than five years after the filing of the parent application, can be considered as a legal substitute for a positive assertion that appellant's particular composition will be useful as an X-ray contrast agent. To say merely that an invention is useful as a pharmaceutical, even coupled with the recitation of certain properties, falls far short of satisfying the precise demands of section 112.

We are familiar with the cases cited by appellant, including In re Johnson, 48 CCPA 733, 282 F.2d 370, and In re Nelson, 47 CCPA 1033, 280 F.2d 172, but because of totally different fact situations between those cases and here, we fail to see how they can be considered controlling.

We agree with the board that one skilled in this art would not know how to use the compounds in issue on the basis of the disclosure of appellant's parent application, hence it fails to satisfy the demands of 35 U.S.C. § 112. Thus the instant application is not entitled to the benefit of the parent application's filing date or to that of the German application.

Finding none of the errors complained of, the decision is accordingly affirmed.

Affirmed.